Case number 21-7135, John Doe 1, individually and on behalf of proposed class members et al., at balance, v. Apple Inc. et al., Mr. Collingsworth for the at-balance, Mr. Shumsky for the at-balance. Morning, counsel. Mr. Collingsworth, please proceed when you're ready. Thank you, Your Honor. May it please the Court. I'm Terry Collingsworth. I represent the appellates here. I'm reserving six minutes for my reply. Our complaint alleges that the appellees, Apple, Tesla, Microsoft, and Google, were on a venture with their cobalt suppliers that involved mines in the Democratic Republic of Congo where my clients were either injured or killed. The plaintiffs were mining cobalt that supplied to the appellees. There are 11 plaintiffs who are children who were injured while mining and five who were killed while mining. And in every case, we've documented that they were working in mines supplying the appellees. The district court issued a sweeping decision with six rulings, all of which are wrong as a matter of law. The district court found that there was no venture under Section 1595A, that the appellants lacked standing to sue, and that the TDPRA does not apply extraterritorially. The court also found there was no forced labor, no trafficking, and no causation for the common law claim. Any one of the first three grounds for dismissal would have been dispositive, but the district court ruled on all of the issues in dismissing the case. Congress first passed the Trafficking Victims Protection Act, the TDPRA, in 2000, and since then has expanded it with various amendments, including the 2008 amendments, which created a broader civil claim for plaintiffs to sue for beneficiaries of any of the ventures under the trafficking statute. This statute has protected children from sex trafficking and migrant workers from trafficking schemes for years. The district court's sweeping decision would essentially repeal the TDPRA and have the consequences of ending all of its protections for all of these years for these people who have relied upon it. The appellees also urge the effective repeal because they're concerned that this case might reach their own supply chains, and we think that it does. I want to talk today about... Can we maybe start by talking about standing? So here the parties agree that there's injury and that there's addressability. And so I'm wondering what work causation does in the context of a TDPRA case. I mean, these defendants did not directly, in some tort way, cause these harms. Is causation created by the statute? You know, when a statute prohibits a venture that results in forced labor? I mean, what's the mechanism of causation? And is it a statutory mechanism, and is that sufficient? Thank you, Your Honor. Well, Article III standing is constitutional, but our position, and I think the district court agreed, that if there was a venture under 1595A that would then cause the appellees to be jointly and severally liable with their co-venturers, who in fact were the direct perpetrators, then there would be standing to sue the appellees as well. So the district court specifically at Joint Appendix 109 held that there was no standing because there was no venture. And I agree with that. If we have a venture, then there would be standing. So do we have to find that there's a venture in order to find that there's standing, or do the plaintiffs have to plausibly allege a venture in order for there to be causation? Well, Your Honor, in the Parker line of cases from this circuit, ordinarily you would have to assume, the district court would have had to assume the merits in reaching the standing question. The district court did not do that here. So I think, though, that it would be almost a moot finding if we don't have a venture, we don't have a claim. So I want to show the court that we do in fact properly allege a venture, and that we would then have standing. Can you talk about that? How is the venture plausibly alleged? There are allegations about direct, knowingly forming long-term business relationships with the tech defendants, formed long-term relationships with the mining companies. Can you say more about what you think comprises the core of the allegations in support of venture? Yes, Your Honor. Putting aside which test would be appropriate, and I think that's an important decision for this court to make, of the various possible tests for what is a venture. You could start with that. Excuse me? You could start with that. Well, there are two common tests that have been applied for years by every court except the district court. The first one relies upon 1591E6, which is a parallel sex trafficking statute. And both the First Circuit in Riccio and the Tenth Circuit in Bisline relied upon that rationale, that it's in the same statutory scheme, why not use the same definition, which is any group of two or more individuals associated, in fact, whether or not a legal entity. Other courts have found that to be too narrow and have zeroed in on really the nature of the relationship, and they're looking for a continuous business relationship that establishes a pattern of conduct with a venture, or could be said to constitute a tacit agreement. Now, in application, these tests are virtually identical because it seems, in the cases we cite in our opening brief at 16 to 17, that even the cases applying the 1591E6 definition are still looking at the nature of the relationship, whether there was a tacit agreement, whether there was a continuous business relationship. So I think that they're, in practice, essentially the same. And I think that would be the appropriate test to apply as sort of a hybrid of those two. But either one is fine. We can satisfy either one. Now, we allege in detail that the basic elements of our venture are, one, there is a continuous business relationship. We have allegations in the complaint that at least from 2016 forward, the appellees were dealing with the same mining companies, Glencore, Huayu, and Eurasian Metals, and that they continue to do so. And when we did our research in 2019, looking at their disclosure forms and so on, they're doing the same business with these same mining companies. The problem really is, as the defendants argue, doing it very indirectly. Ultimately, what they buy, they're buying it from Humacore. They're buying it from, you know, not directly from the mine. It's not that they weren't eventually getting this product. It's, what's the relationship? Well, if they have a direct relationship with the mines to purchase the cobalt coming out of the mine, then everyone understands it's going to make a trip. It's going to be refined and so on. But if they have a direct relationship with the mine, and we say they do, and their disclosure forms say they do, then that is enough of a direct relationship. And we don't even need a direct relationship. We need a tacit understanding. But we allege that, in fact, they've been doing business for years with the very same mining companies, and that it is a direct relationship. Another strong indication of that direct relationship is that all of the appellees told the district court, they told consumers, they tell the public, they tell regulators, and they told this court that they have policies in place at the mine. That means that they have a direct relationship. They say they have the right to inspect at the mine. I couldn't show up and inspect the mine because I don't have an agreement to allow me to do that. So we think that combination is sufficient to create a situation where they have a direct relationship. It's an ongoing business relationship. It's way more than a tacit agreement. And we can assume that this is a reasonable inference to be drawn that across all of these years, if they're getting their cobalt from these specific companies, that they are paying money for that. There's got to be some more formal agreement, although it's not required. Is being in a direct relationship the same thing as being in a venture? I mean, having a relationship, you know, a commercial relationship, a supply chain relationship, it seems to me that the ordinary meaning of venture suggests something more than just some type of contractual, or, you know, just some type of, like, relationship. Well, again, Your Honor, the two major tests, an association in fact, so if they're dealing with each other for years, that's an association in fact, or the other test, a tacit agreement and a continuous business relationship, that's what the statute requires for venture. There's no chance to be associated, in fact, with respect to the wrongful conduct. It doesn't seem like you're in a venture with somebody just because you have some association with them. Even if it's a business relationship, it would seem like the association would have to be more than just a business relationship. It would have to be an association with respect to the conduct, the forced labor, whatever is wrongful about the venture that gives rise to the claim of liability. Sure, Your Honor. The statute itself, 1595A, merely requires that they knew or should have known of the forced child labor and trafficking. The district court didn't rule on that, but in our opposition to the motion to dismiss, we have significant evidence of that. So, yes to your question that they need to have the relationship and they needed to have, they had to know or should have known of the forced child labor and trafficking. And that's sufficient under 1595A. And, again, the district court didn't reach that, so it's not in our appellate briefs. Why isn't the more plausible inference from your allegations that, yes, they knew or should have known? There's worldwide reporting on the child labor at these mines. And also, why isn't it the most plausible inference that they lacked the power to stop it? They set up various initiatives, which you disparage as cynical, but why wouldn't the more plausible inference be that they're trying, but that they really have not been able in the case of mines in a foreign sovereign nation where the involvement of children is sort of pushed into the shadows. You know, the assumption that these defendants can wave a magic wand and resolve this if they want to is, I mean, I'm asking for your response to why that isn't implausible. Well, thank you, Your Honor. The statute doesn't have a defense that we tried to stop benefiting from forced child labor and trafficking, but we couldn't, so we just kept on doing it. The statute says if you benefit from forced child labor and you knew or should have known about it and you're in a venture, then you're liable under 1595A, which is, in fact, a very broad standard of liability. So under the terms of the statute, they are liable. And that brings up what I think I want to conclude on the venture issue is that throughout their argument, appellees weave in this notion that they actually say that if we could be liable, then a cell phone purchaser could be liable. Well, and that's really their defense here, that this would be too broad. It would end the global economy if we knew it, if we were liable. But in fact, if you look at what our allegations are and then you look at what a cell phone purchaser does, no cell phone purchaser who may know or should know of the forced child labor has not associated with or entered into any tacit agreement with or even met with the cobalt mines that are abusing the child miners, nor does such a consumer have an ongoing business relationship with the cobalt mines, as the appellees do, and no mobile phone purchaser has an agreement with the cobalt mines to allow inspections. So there's no, under no stretch for the cell phone purchaser or retail cell phone seller in a venture with these cobalt mines. The universe of those who could be liable is quite small, and that is big tech companies that have the clout really to have a relationship directly with the cobalt mines and to have the ability to purchase cobalt across years directly from that cobalt mine. How are you measuring clout? Is it based on market share or something, or what's the... Well, I don't know. Why are you saying big tech companies that have clout? Well, I think that the measure of clout is their assertion that we have these policies that allow us to inspect. So that's what it turns on for your perspective. Yes. It's their own comment. That's correct. I have a question about the statute. So the 1595A speaks in terms of knowingly benefiting from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter. When it speaks in terms of engaging in an act, does that mean engaging in forced labor writ large or forced labor or trafficking, since the statute covers the entire corpus? Yes. Engaged in forced labor or trafficking writ large, or is it the forced labor or trafficking that plaintiffs suffered from, the incident? Again, the district court didn't rule on that, but in our briefing below, and I'm confident in saying that it is, in fact, if you have to have knowledge or should have known of the trafficking or forced labor occurring in that industry. You don't have to have been there when that kid in particular was injured. You are simply assessing whether, because of their knowledge, they could have done something about it, let's say, but that, in fact, there is general trafficking and forced labor going on in specific... But if the knowledge is about trafficking and the complaint is about forced labor? Well, that's not the case here, Your Honor. I know it's not, but I'm just asking about the way the statute works. Is it that it covers, as long as there's knowledge of engaging in some act that could violate this chapter, that's enough to cover any act that did violate? No, I don't think so, Your Honor. I think you would need to have the specific violation in mind when we're assessing knowledge. I see I've eaten well into my rebuttal time, and I did not even get to extraterritorial jurisdiction. That's right. We'll give you some rebuttal time. I did want to ask a question conceptually about standing, and I think it's back to something that Judge Rao raised, which is we know from TransUnion that in the injury context, even if Congress wants to define an injury in a particular way, that Article III then comes in and narrows the scope of the injury for purposes of standing. At least that's one loss on TransUnion. And I'm just wondering if causation works the same way, because I think the thrust of your argument, and I understand it, and I understand where it's coming from, is that, well, if the statute reads venture broadly, that's all we need to know for purposes of causation, standing. Then the statute already redefines causation in a way that matters for our purposes, and as long as we meet the venture standard under the statute, we've necessarily met the causation standard for standing purposes. And I'm just wondering whether that's right. I don't know that it's not. I'm just wondering whether that's right, because if you apply TransUnion to causation, it seems to me then there's a threshold question whether there's an Article III causation standard that might be narrower than the definition of venture for purposes of the statute. And then you'd have to meet not only the definition of venture under the statute, but also the definition of causation under Article III, the conventional way we think about fair traceability. I don't think TransUnion applies to causation, and I have a specific answer for you. Sure. If somehow a statute, whether it's this one or some other one, expands standing beyond the constitutional reach, then I think the challenger would have to challenge that statute as being unconstitutional because of that, which did not occur here. But in the opposite situation, the Supreme Court and this Court have both held that you cannot make causation tougher in the standing analysis than it is for the statutory liability analysis of causation, and that's Friends of the Earth versus Laidlaw Environmental Services, 1528 U.S. 167 at 181. That's their specific rule, and you can't use standing to make the bar higher than the statute itself makes it. But, Mr. Collinsworth, they don't waive a challenge to the potentially unconstitutional application of causation or, here, the venture definition in the context of standing because standing is a subject matter jurisdiction inquiry and non-waivable. So then we're back where we started, which is, I mean, I guess, under TransUnion, is there some kind of common law or traditional precursor of the venture-based liability that the statute puts forward that would satisfy TransUnion? Yes, but the statute is not being challenged as being unconstitutional for over time. Right, I understand that, but I'm just saying that if the inquiry comes to us through the lens of standing, I'm not sure that matters. So, Mr. Collinsworth, do you think those cases are secret law after TransUnion? Because TransUnion suggests that a statutory injury is not sufficient, right? That you have to have some kind of law or historical analog for Congress to create an injury. So why wouldn't that reasoning apply to causation? I mean, because those are earlier cases, you say, that they're pre-TransUnion. Yes, but TransUnion dealt with injury in fact. So they were saying that you can't create a statute that doesn't really require an injury in fact. But here, we're just looking at simple causation, and it's the same analysis. It hasn't changed. TransUnion said nothing about whether causation changed as a standard, and I think that the dominant case should be Friends of the Earth, which says you can't make it tougher. Let me shift a little bit and ask you about if, you know, I understand that at the pleading stage, you don't have the benefit of discovery. If you were to be allowed to take discovery into the venture question, what would you be looking for? You know, I mean, it's a little troubling to rely on the ameliorative efforts of the defendants to show the connection. But what would be the now not available information that you would turn to? Yes, thank you, Your Honor. Well, first of all, we're not faulting them for having policies. We're faulting them for really using the policies as a public relations device, not as a preventive measure, and that they do show that there's a contractual relationship. But what would we get in discovery? We would like to see what contracts exist between them and the mining companies. What we know from the disclosure forms that many of them had to file with the state of California is that they list the mining company as the supplier. They don't list this chain of refiners. They say Huayu, Glencore. So we would want to see those contracts. We would also like to see – we know, and it's in the complaint that we allege that Apple got a very bad report on their activities in the cobalt sector in the DRC, and they fired that person who was there in charge of social responsibility. I'd like to see the reports each of them have showing their own information about what they know about what's going on in the mines, their mines, and I'm pretty confident that'll show that kind of direct connection that we are alleging. So I think the contracts with the mines, what they knew about what was going on in each of the mines, and really what's behind those policies. Do they think those policies are going to do anything at all, or are they a public relations device? Don't you have to reach down further, not just to the mining companies, but to these labor brokers? I mean, that's where your complaint alleges threats are occurring, is when the labor brokers who are dealing directly with children bring them on board. I mean, you're going to need to know something about the involvement of the mining companies, the labor brokers, and indeed the tech companies' knowledge or reckless disregard of that final link to the alleged forced labor. Absolutely, Your Honor. I don't really view that going to the venture question as much as to the forced labor question and the trafficking question. Who coerced them, and then what's their relationship back to the mining companies? We allege in the complaint right now that they're agents of the mining companies, and I think that's fair at this point. Particularly, there's a gentleman named Ishmael who was involved with about nine of our plaintiffs. He recruited them, told them to work. They viewed him, at least from the plaintiff's perspective, as a manager or a supervisor of some sort at Glencore. So, yes, we would want to get that information. Again, I think that goes to the forced labor and trafficking questions more than venture. What's, for example, Alphabet's relationship with Ishmael? How do you see that all the way to the statute? Alphabet doesn't need a relationship with Ishmael. Alphabet has a relationship with Glencore. I'm just saying, walk me through, ultimately, there might be somebody else who has a relationship with Ishmael. But you have to walk from Alphabet to Ishmael somehow. Yes. Can you just walk me through the route? Glencore owns the mine where nine or so of my kids were killed, where Ishmael is in charge. So we're alleging that Ishmael is an agent of Glencore. So Glencore is responsible for Ishmael's actions. If Alphabet or Apple or any of them are in a venture under 1595A with Glencore, then they're jointly and severally liable for whatever Glencore did to injure these children. That's how joint and severability works. And Glencore is responsible for Ishmael because Ishmael is an agent of Glencore. And then Glencore is associated with Alphabet and Alphabet and other companies are jointly and severally liable all the way through to Ishmael. Yes, John, and it's not a very complicated chain. It really is each appellee in a venture under 1595A with either Glencore or Huayu, which is directly responsible for injuring children. Can I ask you on this question of whether there needed to be a challenge? This is back to the relationship between causation, understanding, and ensure. That there needed to be a challenge to the statute as unconstitutional because it concedes a causation in a particular way that's too broad. That's what you were saying. No, I'm sorry, Your Honor. What I meant to say was that the only way you could argue that, say, the TVPRA goes beyond constitutional standing is to challenge the constitutionality of the statute. That's not an issue here. I think we all agree that if there is a venture under the statute, that causation would be satisfied because of the joint and several liability of the co-venturers. I don't know if everybody agrees. I mean, I'll be curious to see if the other side agrees with that because I thought the way this was teed up. I think that, excuse me, I think Judge Nichols agreed because he did turn his standing analysis directly on the lack of a venture. I thought what he was saying was that your argument is that venture satisfies causation and you're wrong as the venture and, therefore, your argument as the causation is wrong, too. But then the way he'd done causation already is under the Fair Traceability Test conventional standing analysis, not that everything stands or falls for causation purposes on whether there's a venture. I thought he was taking you on your terms and then saying that you're so wrong because, in his view, venture wasn't satisfied either. Well, he did explicitly say that, yes. He said there is no venture and, therefore, there is no standing. But our position is that if there is a venture, then the venture itself is that the injuries are fairly traceable to that venture and all of the co-ventures, including the appellees, would be jointly and severally liable. Now, I still haven't mentioned extraterritorial jurisdiction. It's up to your honors. I can briefly – How is this any different from RJR Nabisco? I mean, there's underlying offenses, some of which apply extraterritorially. And in RJR Nabisco, the court specifically said we have to look separately at the private right of action to see whether it has been discharged of extraterritoriality. And I'm not sure what your claim is other than that there is a private right of action and there is extraterritoriality and some of the offenses apply extraterritorially. I'm just not sure how that's enough under Nabisco. Well, it is true that in RJR Nabisco, when looking at the civil claim under 1964C of RICO, the Supreme Court found that there were no predicate acts that were incorporated into the civil provision. But it did find in the criminal provision 1962, which is much more similar to our situation here, that there were predicate acts that were incorporated, and therefore the criminal portion of the statute was extraterritorial. And I think we even have – I'll get to that. But we have an easier route to that because this case is much easier than RJR Nabisco because we have explicit extraterritorial language in 1596A. And that was the approach of the Fifth Circuit in Attica. They just looked at 1596A and said that it extends 1595 extraterritorially. The court said, quote, 1596A explicitly rebuts the presumption against extraterritoriality and that Section 1595 unambiguously did not apply extraterritorially until Section 1596 was enacted. So we have this direct extraterritorial language that RJR Nabisco did not have. In addition, however – How is it direct if 1596 doesn't mention 1595 but mentions other statutes? 1596A lists six predicate acts that it is extending extraterritorially. All of those predicate acts allow you to sue under 1595A, and in this case we're using only two of the six, forced labor and trafficking, 1589 and 1590, which were both extended extraterritorially by 1596A. In addition, though, if we just do the straight predicate acts analysis of RJR Nabisco, wholly apart from this direct extraterritorial language, the argument would be exactly that, that 1596A creates extraterritorial jurisdiction for six predicate acts, and they're all – you can sue for any of them under 1595A, which makes them extraterritorial for purposes of civil claims. I would direct your honors to a brief filed, an amicus brief filed by the legal scholars, that I think they call themselves, with expertise in extraterritorial jurisdiction, but it's the amicus brief we call the legal scholars brief. At 11 to 16, they have a very – they had more pages than I did, but they have a very detailed analysis of this predicate acts assessment from RGR Nabisco. Thank you, counsel. We'll give you some time for rebuttal. Thank you. I appreciate the extra time, your honors. Mr. Chomsky, over to you now. Thank you. Good morning, your honors, and may it please the court, I'm Eric Chomsky. I represent Microsoft and I'll be arguing on behalf of all of the defendants. As my friend on the other side acknowledged at the outset, there are multiple separate reasons that the district court concluded the TVPRA claims must be dismissed. There is no constitutional traceability between defendants and plaintiffs' alleged harms. Plaintiffs' claims are impermissibly extraterritorial, and there were multiple problems with the pleading of the venture and the underlying predicate acts. I want to start with standing this morning, but before I do, I feel compelled at least to pause to note, I want to be clear that no one diminishes the problem with child mining in the country. The arguments here are simply that this lawsuit is not an appropriate solution for dealing with them. So let me start with standing. Plaintiffs lack standing because they have not plausibly alleged that defendants caused their harms. That is, that the injuries are constitutionally traceable to defendants. Mr. Chomsky, so what about the fact that this statute, so Congress here has provided a causal mechanism. I mean, if the companies here are in a venture, then that would satisfy statutory causation, arguably. So is it your position that, you know, applying causation in that way under the statute is unconstitutional, or it exceeds the bounds of article for standing? Judge Rao, I might conceive of the inquiry a little bit differently. It seems to me that the appropriate inquiry, given that, as the Supreme Court has said numerous times, that standing is an irreducible constitutional minimum, you have the factual allegations. You look at whether they satisfy the statute, but you also look separately to determine whether you have constitutional standing, constitutional traceability. And what the court has said over and over, what this court said in the en banc decision in Florida-Audubon, is that where you have a, to use the language of that case, a protracted chain of causation, then you have an article three problem. So does that mean that even if, let's just hypothesize that the statutory test of venture is satisfied, because Congress meant for there to be a venture here, would it mean that the cause of action still can't go forward because causation for article three purpose is not satisfied? So I want to be careful in answering the question in the following sense. Obviously, it would depend somewhat on what you think the statute means in terms of defining venture. However, on plaintiff's conception of a venture, that is to say it is literally any tacit agreement to purchase goods, then yes, there would indeed be an article three problem. You might meet the statute, you might meet the statutory test. Of course, we've argued that that is not the best understanding of venture. But you would still have the constitutional traceability problem. I mean, to use a sort of more extreme example, if Congress said that we're going to draw lots to see who's liable under the statute, or if we're going to impose liability under this statute on everyone whose last name begins with the letter S, then you and I would be on the hook for there would be a defined injury. But no one would think that that would solve constitutional traceability. But there would be other constitutional problems with that statute. I mean, I think there would be a pretty robust people protection claim on behalf of all of us whose last name begins with S. But in terms of just the relationship between causation and standing, why isn't it the case that if Congress decides, for whatever reason, we want to allow for expansive liability even in circumstances in which we want to enact essentially a workers' comp law, an insurance law that just says, I'm sorry, if you're in the purchase chain, you're on the hook. And even if that wouldn't be traditional causation, even for tort principles, we're just doing that as a matter of our assessment of what the best policy is to put into effect the best incentive scheme. That's what we're going to do as a matter of statutory liability. And the way you're conceiving of it, and I'm not saying there's no foundation for it, and that TransUnion doesn't suggest a possible hook for it under Article 3, but your conception of it would be that, well, still, that's too bad. Congress can't do that in a way that allows courts to adjudicate a cause of action under that statute, because there's an independent Article 3 causation in front of it. Oh, I'm sorry, Robert. No, that's OK. So I think the answer to your question is in part TransUnion, and it's in part something, Judge Pillard, that you said earlier. So TransUnion and Spokio tell us Congress has some flexibility, but the Constitution still operates as a kind of bottom line, as a backstop to prevent going beyond cases and controversies in the traditional sense. And so what you often see, and this, Judge Pillard, is where something you said a moment ago comes in, where you have traditional or common law precursors, I think it's the language you use, Judge Pillard, when you have ordinary notions of causation of collective responsibility, then those tell you that that may be a way to move through a causal chain in a way that's constitutionally OK. But again, hypothesizing plaintiff's understanding of venture, this extraordinarily capacious idea that literally if you just buy the raw cobalt, then you are in the chain and you are on the hook. I don't think that's the statutory theory. And in terms of common law precursors, I mean, I know this whole issue hasn't been briefed, bringing it up here, which is, I understand, a little bit perhaps demanding. If you had, you know, back in England at common law, you had a group of miners and, you know, somebody who ran the local pub who was outraged about the way they were being treated and gathered them together and they got their nephews and cousins to, you know, to come together and rise up against the mine owners. I mean, the fact that the person in charge is several lines removed from the ultimate people who are, you know, wielding pickaxes against someone wouldn't, I don't see a common law causation problem with some kind of joint and several liability there if there's a venture. And maybe we'd have to go back and look at the common law analogs to the venture idea. But if there's some common ongoing activity with some degree of knowledge and power, where's the flaw? And I recognize absolutely that you can test it, but that's alleged. But just for purposes of clarifying whether there is a constitutionally questionable element to this theory. So I'd say a couple of things about that, Judge Pillard. First of all, recall, of course, that we're talking about a very different set of alleged facts here. We're not just talking about the mine and the worker. We're talking about, you know, seven layers of separation. But finally, what this Supreme Court has said is that the injury has to be traceable from the defendants all the way down to the plaintiff. You have to have some way to work through the causal chain. And I want to pause on the notion of joint and several liability because it's been invoked a few times. There is no allegation in this complaint that there is joint and several liability in the traditional sense. There has been no invocation of, to use the language of the restatement, a tortious act in concert, for instance. Again, that goes back to the point I was making about plaintiff's theory of venture. We are worlds apart from traditional joint liability in that sense. And if someone had actually, properly, plausibly pleaded joint liability, joint in the sense of joint and several liability, that might be a way to work through the causal chain. And there are others, too. I mean, I don't want to be misunderstood as suggesting that our theory is overly demanding. There are other ways to work through a causal chain. There's the language of determinative or coercive effect that Bennett v. Speer and the Tarani decision that Judge Nichols pointed to and used. You can have alter ego. You can have conspiracy. I mean, there are ways to shorten a causal chain. The difficulty for plaintiffs here is that with all of these steps, they can't move all the way through it. Can you point to a case in which causation has been the grounds on which standing has failed? Just pure causation where there was not a redressability problem or an injury in fact problem? Because it seems like in many of the cases, causation is mentioned as one of the requirements for standing. But it's often talked about in terms that either substantially overlap with injury or with redressability. And there are very few cases. I was able to find only a couple where causation was discussed in a separate way. So I'm wondering if you can point us to any such cases. So Judge Corral, we found the same thing. I think part of that is frankly because of the legal theory we're dealing with here. In an ordinary case where someone commits a tort against someone else, right, there's a traffic accident, causation is pretty clear. And if the person who is responsible for the accident is an agent or an employee, then it's pretty clear how you move the next step in the causal chain. Causation often isn't tested because you often aren't talking about the fair purchase of a fungible commodity at the other end of the earth. The cases that we have found are typically cases in this court about procedural injury, for instance, Florida auto bond. It wasn't very different, right, because here there is a private harm. I mean, these plaintiffs have undoubtedly suffered a concrete and particularized injury. And they are seeking money damages. I mean, also injunctive relief. But it's just focusing on the money damages, which means there's redressability because, of course, this court can award money damages. And so then, you know, what work is the, like, I guess you have to have, I think, some theory about why Congress can't loosen that causal link. If you think it doesn't exist, you know, as a matter of sort of ordinary causation principles, why doesn't it exist under the statute? So a couple of thoughts. Absolutely agree with the observation that ordinarily you will have a redressability issue or an injury question. This is a bit unusual. A couple of things to say about that. First of all, of course, there is no case saying that causation drops out. On the contrary, there are dozens of cases saying that traceability is an independent constitutional requirement. I think the sort of structural reason for that relates to the same basic separation of powers questions that underlie a lot of standing doctrine. You need to make sure that you have the right parties before the court. And you need to make sure that the court is limited in addressing a concrete dispute and not a broader policy question. Congress has arguably addressed what's fairly traceable. They're saying if you, you know, if someone is an adventurer with people who engage in that, then we will say this harm is traceable to them. So is it your view that Congress can't define that traceability? I understand you can test whether you are in a venture, right? But if you're in a venture, why isn't that legislative determination that that satisfies traceability sufficient? So, again, I think the answer lies in cases like Ramirez, TransUnion and Spokio, which say Congress absolutely has some flexibility. But what those cases tend to do, and admittedly it's in the context of injury, is they tend to say there are limits on that. And it is up to the articles reports to determine whether what Congress is doing. And again, here we're hypothesizing, again, this exceptionally capacious notion of a venture. But that what Congress is doing goes beyond traditional notions of causation or collective responsibility. Let me ask you, Mr. Shumke, about you mentioned the incredibly capacious notion of responsibility. And you mentioned the bare purchase of a fungible commodity at the other end of the chain. And help me out, because I think one of the hardest things for your clients in this case is that they are major buyer of these minerals in the world. And these mines are the major extractors of these minerals. There's not a lot of fungibility, actually. And I would assume, given the sophistication of your clients and the importance at this stage of these minerals to their products, that they aren't just waiting and buying a fungible commodity from UMACOR. This is the thing that I think makes it more plausible than it might otherwise be that actually there is a direct relationship between your clients and the mines. Right? Because what responsible technology company would allow itself to be beholden to and wait and decide whether a Chinese company is going to favor them with their essential ingredient? So if you'll bear with me, I want to unpack a few predicates there, because there's several and they're all very important. So first of all, going back to a question, Chief Judge Srinivasan, that you asked, when you look at the relationship between, for instance, Alphabet and Ishmael, there are numerous steps. And my friend on the other side, Blaster, conflated some of them. And everything I'm about to say is straight out of the complaint. It is from Ishmael to CMKK to Glencore to UMACOR to Alphabet. So he said, my friend on the other side, said a few times, for instance, that the defendants have direct relationships with the mining companies. That is not what the complaint alleges. What the complaint alleges is that they are going through multiple layers of intermediaries. And that assertion built into it is the notion that, for instance, Glencore and CMKK are the same thing. And that's not actually what the complaint alleges. Judge Pillard, going back to another aspect of your question, I don't think it is alleged that these five defendants are the major buyers of Cobalt, or what is underlying that suggestion, that they have overwhelming market power, such that at least if we're talking about constitutional control traceability, that they are controlling everything that happens all the way down this chain. And on the contrary, if you look at, for instance, page five of the complaint, the allegation is Cobalt is used by all other tech and electric car companies in the world. And indeed, there are also numerous mines and numerous suppliers. And so what we have is instead this incredibly complicated web with no plausible allegation of constitutional control sort of all the way down. I do. I want to be cognizant of time. What do you mean by constitutional control when you have no plausible allegation of constitutional control? What would that look like? Well, so again, I mean, to use the language of Bennett versus Spear, one way you would show that is that there is a determinative or coercive effect. That's one test that courts have used to look at ways to move down a causal chain. And again, we don't have that here. We don't have any allegation, much less a plausible allegation that one of the defendants, pick one, Apple, so controls me for and that me or so controls Glencore and Glencore. So controls CMKK that you can attribute the acts all the way at the bottom of the chain. There was a suggestion before that you have to reach down to the labor brokers. There is no allegation. There is no suggestion that the acts of the labor brokers are pause in that sense of control as a constitutional traceability notion all the way down this. I guess what I'm asking is for what would be the allegation that would suffice? I mean, I'm not asking you to argue against yourself, but if suppose that it was there were allegations about market power and it was 90 percent at every stage. That you go through seven letters and this entity has 90 percent ownership over this entity. This entity has 90 percent ownership of this entity. Is that the type of thing that would be enough to get to the determination and control to meet constitutional control for your purposes? So I want to be a little bit cautious about talking about market share. We're sort of tiptoeing into antitrust sounding stuff that has the same pleading requirements. I think going back to a colloquy that we had earlier, you would be looking for these kinds of traditional notions of control or joint responsibility that are the ways you move through a causal chain. Like what? So conspiracy, alter ego, true, historical, traditional, joint and several liability. If it were truly to take an extreme example, if everyone all the way down this chain sat down in a room together and said, let's do some forced labor. Then that would look like traditional circumstances in which they are all in it together in the causal sense. And Congress knew in writing this statute that that's not what happens with sex trafficking. That's not what happens with human labor trafficking. That's not what happens with forced labor, forced child labor. Nobody sits in a room and says we're doing this. It's very much head in the sand, not in a wink, benefiting. I mean, I think that's part of the explanation of why there is a venture concept in the statute. And so you also mentioned a moment ago, and I'm really struggling with this question about how to understand the traceability given the unique situation of this is where the minerals are on the earth. And you said that there are many, not only many different tech companies, not just defendants, but many suppliers. And I guess that raises the question, if companies on notice, if there is this pervasive and difficult and illegal child labor going on, why not choose a different supplier? Well, so I'd offer a couple of thoughts, Your Honor. First of all, it is alleged in the complaint that defendants indeed are trying to make efforts to ameliorate the problem. That is, as Your Honor pointed out, a very separate question from whether someone is causally responsible for it. Going back to the beginning of Your Honor's question, I don't mean to suggest that the only way in which there could be venture liability or separately causation would be everyone sits down in a room. And there are examples in the cases of ventures. You know, Riccio is sort of a classic example of it, one of the motel cases. The difficulty is that what we have here is something so far removed from that. It's as if in the motel cases, you were putting into a single venture everyone who works in every single motel in the country, every single motel owner in the country, every single franchisor of a motel in the country, and all of the sex traffickers who happen to use any one of those franchised motels. I don't at all mean, again, Your Honor, to diminish what Congress had in mind here or the danger of the existence of the underlying conditions. But again, that's a very separate question, which really just speaks to the question of knowledge. And obviously now we're moving over to the statutory question. It's different from the motel one, even in the way that you described it, because appropriate acts that occur at motels, they happen, but they're not routine fare. And I thought part of what's going on here is the incidents, the extent to which people are on knowledge, anybody involved in this area is on knowledge, that the source of abuses that are alleged in the complaint are part of what happens in my agency. I apologize, Your Honor. I'm not sure I understood. So in other words, I mean, I take the point about motels, that if you're in – it's not every motel, every franchisor of a motel, with respect to some particular incident that occurs in a motel, because those seem like one-offs. You're participating in the enterprise of motels for all kinds of reasons, including legitimate lodging. That happens all the time. Whereas with forced labor and abusive practices that occur in mines in the DRC, I thought part of what's going on here is that there's general knowledge that this happens. That's why your clients are engaged in efforts to root it out. You don't see that kind of effort going on in the motel industry, because that's just not something that exists in the motel industry as regular fare. So I don't know a lot about the motel industry, but I've read a bunch of these cases. I'm not sure that's actually necessarily true. I think there is some sense that this sort of thing does tend to happen with some level of pervasiveness. But I think the broader point, Your Honor, is that if that were enough, if it were enough to simply be anywhere in a global – use the term in a colloquial sense, venture, that every single supply chain in the world, if you sue enough people, you could impute to them some level of knowledge. That would be true of the entire cocoa industry and the entire rubber industry and on and on and on and on. And there would be no statutory limit on that. But at most – and this goes to a question, Your Honor, that you asked earlier – that would only speak to the knowledge question. That's the question of whether you have to have knowledge about acts or just knowledge broadly about problems. That doesn't answer the predicate question of what it means for there to be a venture and what it means to participate in a venture. And if I could shift over to that. Let me just ask you one question about that. Mr. Schultze, do you agree that if there is a venture, that there's standing? That if this court were to think that there were a venture here, that there would be standing? I want to answer the question very carefully. If the facts establish a venture on the other side's understanding of what a venture is, that is to say, a passive agreement to purchase a good. If that is the only thing that would satisfy the statutory element of a venture, then no, I do not think there would be constitutional traceability. Right, because you think there's an independent constitutional requirement. Exactly. That Congress can't. Right. And Congress cannot loosen it. At some bottom line level, no. There is – again, the line is sort of a cliché at this point – but if there is an irreducible constitutional minimum, there is something that Congress cannot go past. And it has flexibility. I was just going to interject that you characterize the other side's view as that a venture is a passive agreement to purchase a good. But what I took Mr. Collingsworth to be arguing is that although he hasn't been able to gain access to any of the contracts, that it seems likely that there are actual agreements. And he points to the monitoring and that kind of stuff as sort of illustrative that there's some direct interaction. And he says, you know, the likelihood is – and this is also illustrated by the Tesla direct, I gather, agreement with Glencore – that it's likely that all of these companies say, look, you're going to prioritize selling me X share of what you're producing, mine. They're not waiting for it to go through Umacore and dealing only there. And if that were the case or if that were, A, alleged, which you may disagree with, B, proved that these defendants have agreements, even though they're ultimately buying the refined cobalt through Umacore, if they have agreements with these mines to say, look, reserve for me, you know, your best 50 percent, Is that constitutionally inadequate for purposes of traceability? I thought Your Honor was going to ask a different question. For constitutional traceability purposes, then obviously that would collapse the causal chain quite a bit. Let me fix the answering the question by focusing on the statutory piece. The question is, what is the agreement? What is an agreement? What is it an agreement for and with whom? So the allegations here are that it is an agreement to purchase a good, not with a mine. That is not what has been alleged. But with someone farther up the chain, there is, Your Honor alluded to the bit about Glencore and Tesla. The other side has acknowledged that that post states any of the allegations here. But when you if you look carefully at the complaint, the allegations are that these purveyors, Glencore and YU, that they are not themselves the mine owners. And so, again, there are there are multiple layers built in there. But more fundamentally. It does not matter that the power is with certain players and the fact that they may have some layers of subsidiaries. Those layers of subsidiaries are agents and will do what they want. No? There is no allegation that they are agents. There is no allegation that they have control over them. There is no allegation of alter ego that says you can push them together. And pausing on the notion of alter ego, even if they have alleged alter ego, alter ego is when you sue one company. You can when it doesn't observe corporate formalities, go after its parent. But there's no doctrine of alter ego that I'm aware of that says you can go through to a third party who might not even know about the alter ego issue with regard to the intervening ones. There is no plausible allegation here that there is a kind of power that I think your honor was just— Do you think so? Do you think that the complaint, based on the allegations of a divorce from what we know about the world, is the same as if the complaint were against some company we'd never heard of that uses cobalt in a product? I'm not quite sure how to answer that. I mean, there is no allegation of market power here. There is no allegation that these companies control. I mean, I think it's really important to focus on what the complaint alleges. The complaint alleges that they have purchased a good and going back to the language of the 11th Circuit and red roof and merely having a supply contract, merely purchasing— Then I don't know why the answer to my question is yes. I don't know why it's hard to answer it if that's—because I think all I'm trying to get at is if there's no allegation about market share, if there's no allegation about control in the way that you're talking about, then the fact that we all know what Tesla does and Apple does, is it the same thing as if the allegations were against a company who was alleged to have purchased products that use—I'm sorry, manufactured products that use cobalt, but we've never heard of the company? Is that your— I misunderstood the thrust of the question. Yes, then I think it is the same. I think it's important to go back to the statutory term, the language of a venture, and remember the 11th Circuit and red roof ends, looking back at a variety of sources, has sought to define that term and that ordinary notion of a venture is taking part in a common undertaking or enterprise involving risk and potential profit. It typically looks like a partnership where, as Judge Nichols put it, you're in a commercial enterprise together. Buying something in an arm's length negotiated transaction is worlds apart from the ordinary understanding of the term venture, and certainly it isn't participating in a venture within any sense of that language. I think this court's decision in Papano is really instructive on that. It talks about what the term participation ordinarily means, and it's a form of active involvement. It's not just mere assistance. Of course, I mean, buying could be—it could be a venture. It's just that—well, your point is it's not alone enough to constitute a venture. I mean, you could have buyers that have control over a seller in a way that constitutes every bit of a venture in the conventional understanding. Yes, Your Honor. I think you would need to know a lot more, and you'd have to have pretty far-reaching allegations to show you that it wasn't just a buy-sell purchase, that, in fact, they had control over their supplier. But, again, we just don't have that. Does the ordinary meaning of venture require some concept of shared risk? Yes, Your Honor. I believe it does, and that was what the Eleventh Circuit held. I mean, the most traditional sense of the term is something that looks a lot like a partnership, right? And there are a lot of different ways in which you could have that. Someone contributes capital. Someone contributes labor. They open up a coffee shop together, right? Someone's funding it, and someone's pouring the coffee. Do you think on the ordinary meaning of venture, as you're defining it here, that would be sufficient for standing? That would be sufficient for causation? If someone could show there was shared risk and participation in a venture, on that definition of venture, would that meet the Article III requirements for causation? I think ordinarily it would, Your Honor. I think that would be the type of, again, to borrow Taylor's term, or language, the type of ordinary common law or traditional precursor that looks like the sort of thing that ordinarily gives rise to standing. It would be the sort of ordinary collective responsibility. But again, it's exactly the thing that plaintiffs have avoided here, that they have said they don't have to show. And I think that that's really telling. I mean, part of the reason that we're in this, as you put it, Your Honor, sort of unusual situation about the outer reaches of standing and why there is this kind of push and pull here between standing and venture, it is because of this extraordinarily broad notion of venture that has been alleged here that puts the pressure on both the venture definition, but also on Article III standing. You can imagine lots of other ventures, Riccio again being a perfect example of it, where, you know, you have neat questions about how far the venture goes. You don't really have any meaningful Article III problem because you're just talking about a step or two of removal. Red Roof Inn says, all right, now we're looking a step farther and it starts getting harder. When, as here, the idea is we are going to throw in five huge manufacturers at the opposite end of the world, that is the thing that puts extraordinary pressure on all of these concepts. How much does it matter? I mean, it feels intuitively almost like it does, but I think that might be an error. How much does it matter that it's at the opposite end of the world? I mean, if they were companies that were aware of and benefiting from and having some kind of direct negotiated flow of goods from, you know, a child labor sweatshop in Los Angeles, it feels like it might be different, but I'm not sure conceptually that it is. And if a business at the end of the supply chain, a retailer, was careful to put some subsidiaries and some agents into the line of the supply chain, to me that feels more likely to be treated as a venture. And I feel like that might be your impulse too, but I'm not sure why. And I'm not asking you a very clear question, but you mentioned several times this is on the other side of the world. And I'm just trying to isolate that factor and bring it closer to home. I don't want to overdo the point, Your Honor. I don't think it's dispositive. I think it's just illustrative of the extraordinary breadth of the theory here. I do want to be cautious again, Your Honor, talked a moment ago about interposing agents into or subsidiaries within. Then again, going back to this same discussion we've been having, then you would look at whether it truly is an agent in the traditional sense. And ordinarily, you are responsible for the actions of your agents within the scope of their employment. And that would be a traditional way to work your way up the chain, both for constitutional causation purposes and probably separately for purposes of thinking about who's in the venture together. And so if the forced labor is in Los Angeles as opposed to the Democratic Republic of Congo, we might imagine that there are fewer layers. But I don't know that there's something doctrinal that answers that. Well, one way that other side of the world fits into it is extraterritoriality to some extent. And can I just ask you one question about that? So why would Congress have specifically decided that there is going to be jurisdiction extraterritorially for criminal purposes, but then not have extraterritorial reach for U.S. companies? So I think the answer is in RJR Nabisco. RJR says, and this is at page 347, defining a cause of action based on conduct within the territory of another sovereign carries with it significant foreign policy implications. And so it then says a couple of pages later, the presumption against extraterritoriality must be applied separately to both of the substantive prohibitions in the private right of action. And that's exactly what, as Your Honor noted earlier, that's exactly what happened with RICO, right? I mean, the holding of RJR Nabisco is that Congress applied criminal RICO extraterritorial in an extraterritorial fashion, but not civil RICO. And one reason for that is given the potential for international friction in criminal cases, you have the mediating effect of prosecutorial discretion. And in fact, in this statute, we have clear textual evidence that Congress was attentive to that in 1596, the provision that renders extraterritorial some of the underlying offenses. There are specific limitations on who can be prosecuted and the unusual requirement that only certain very high ranking DOJ officials, the Deputy Attorney General and the Attorney General, can authorize those prosecutions. And Congress even says that's a non-delegable decision. I think that Congress was attentive to exactly the risk of the situation where any private plaintiff can go after conduct that occurred outside of the country. And on your reading of the statute, the Roe v. Howard extraterritorial application would also be part. I think it's very hard to square Roe v. Howard with RJR Nabisco. Roe, the sort of rationale for it is this suggestion that in RJR there was a gap, as they put it, between the predicates and the civil prosecution. It's just not a fair reading of RJR. When you look at what RJR was focused on, it talked about, again, this potential for international friction. And that's what drove the court's holding that you need something more where you're talking about a civil cause of action. Yeah, and that's a powerful difference. It really is a powerful difference between criminal, where the government has discretion and control, and they're really quite rare, those actions and civil where anybody can raise a claim. It might not even be meritorious. Right. Oh, I'm sorry, Your Honor. I find it hard to think that Congress actually didn't intend the civil action to apply overseas. They enacted the 2008 amendment before RJR Nabisco. And one thing that's different about RICO from this statute is this statute has the explicit extraterritoriality provision. RICO didn't have to. In RICO, the court was dealing entirely with the predicates, the underlying criminal, the definitions of those crimes. Does it make a difference that here there is an explicit separate section talking about extraterritoriality? I think if anything, that makes our argument stronger rather than weaker. Both RJR at page 339 and Morrison at page 265 say that where you have a statute and Congress has made certain provisions explicitly extraterritorial, that tells you that they probably intended the opposite for the ones that aren't explicitly denominated as extraterritorial. And beyond that, not only does 1596 not list 1595 as an extraterritorial provision, Congress amended 1595 at the very same time that it enacted 1596. So this isn't one of those situations where, rare as they are, one might say, well, maybe Congress wasn't really thinking about this. Congress was looking at these particular provisions at exactly the same time. And when they did it, when they enacted 1596, they used the language of criminal law. Congress referred to an offense, which Kellogg, Brown, and Root tells us the Office of the Solicitor General couldn't find a single statute in which offense was used in a civil sense. Also, the civil remedy provision talks about victims bringing suits against perpetrators. And a perpetrator is typically not a tort user. It's a criminal perpetrator. So there's a little bit of loose language in that civil remedy provision, too. Fair enough, Your Honor. I don't think that overcomes that broader problem. It's also noteworthy that all of the listed provisions in 1596 are criminal, that 1596 talks about prosecution of offenses, and again, that 1596 has these built-in extra safeguards beyond ordinary prosecutorial discretion. If plaintiffs' theory were correct that 1596 made, for instance, 1589 extraterritorial and 1589 flows through 1595, those protections that Congress explicitly put in 1596 would be out the window. I think the claim would be not that 1596 made 1595 extraterritorial, but that 1596 defines the parameters of extraterritorial application in the criminal context against the backdrop of extraterritorial application in the civil context. So I think the argument – well, I won't speak for the other side. My understanding is that the argument is as I've characterized it. Yeah, I didn't mean to suggest that that was necessarily their argument. I think that would be a hand argument in the air that would work because it could work, notwithstanding your understandable points about the terminology of 1596. 1596 would be the bad operator against the backdrop of extraterritorial application that already exists in the civil context. Because of the context of trafficking and forced labor, everybody knows that what Congress is looking at involves an international dynamic. Well, to be sure, the statute involves an international dynamic. But remember, both the TVPA and the TVPRA have tons and tons of provisions. These are omnibus statutes. And in fact, the TVPRA, if you look at the language of the bill itself, it has a whole title combating international trafficking in persons that doesn't relate to the provisions here. So to be sure, everyone understood that aspects of this are international. I think that's sort of weak key to show us something more that the Supreme Court has said we need to find if we're going to take a civil provision. Why? Why? I mean, RICO is very much thought of as domestic. You know, it's time-oriented. It's responding to problems that were at least initially perceived to be really principally domestic. But I do think that the findings and the hearings and the attention on the matters that this act covers has been very much international. So why isn't that something which the court said could be, doesn't have to be explicit? So I think that that cannot overcome the fact that, again, Congress was enacting 1595 and 1596 at the same time and said nothing about extraterritoriality in 1595. And again, we go back to Chief Judge Srinivasan where you and I started. There are other provisions of the statute that are absolutely explicitly extraterritorial and always have been in 1586 about transporting slaves from one foreign country to another on a boat. As I read it, I think it may be only extraterritorial. But against that background. But only criminal in your view. Yes, Your Honor. I mean, it is a criminal provision. My point is simply that in a statute in which there are explicit indications of extraterritoriality, Congress chose not to do any such thing when it enacted the civil provision. If I could just add one finishing thought on this point. Judge Pillard, you started by asking about Roe and we were talking about this question of a gap that reportedly was an issue in RJR. But leaving aside the fact that in RJR that was really the icing on the cake. I mean, if you read the decision, I think the introductory language is, if anything, meaning if that gap means anything at all. There's a similar gap here too in the sense that 1595 through the parenthetical, the benefiting from participating, expands the underlying predicates in a way that most of them wouldn't already apply. And so you have, if anything, an even more powerful signal through that kind of gap that you would need something more for Congress to have indicated that it intended to go abroad. Whereas here you're saying this is a broader civil claim. Yes, and so it implicates even more powerfully the concerns about international friction that motivated the decision in RJR. Although it's interesting to me that the court, I'm not sure I entirely understand why the court seemed to think that was important. But somehow if the civil claim, civil cause of action was authorized for everything that was subject to criminal prosecution, that somehow that would indicate that the civil claim should or was intended to reach extraterritorial. I'm not sure I entirely follow that logic, but that's why I took the court to ice that cake, as you put it. So I think what the court was getting at in RJR was obviously dealing with RICO, and it's this sort of multi-layer thing, right? So you have the predicates and then those filtered through the criminal provision, and then they also can give rise to civil liability. And the court says the predicates, they sort of, they define the criminal offense, right? They're absolutely made it up. There's like a one-to-one. And I think what the court was saying is once you move away from that to the civil domain where it's calibrated differently than if anything, it tells us it's not that same kind of pairing. It's not a definitional match between the two. And that's a way that the court sort of looked at a difference between the criminal and the civil incorporation. Again, I share the feeling that I sense is underlying the puzzled look on your Honor's face. I mean, obviously, the court was a bit at pains to figure out how to work through that. But I think it applies absolutely squarely here for the reasons we've been talking about. Thank you, counsel. Thank you. All right. Mr. Collingsworth, we'll give you four minutes for rebuttal. Thank you, Your Honors. Just briefly on extraterritorial jurisdiction since that was the last topic you all were discussing. I do want to pick up on the fact that 1595 and 1596 were enacted at the same time, as was pointed out. 1596 was enacted for the first time, and 1595 was amended in the 2008 William Wilberforce Trafficking Victims Protection Act amendments. And in 1595B, so you'd think they were working together. They created a scheme of some sort at the same time that made sense. 1595B makes the only distinction in the entire scheme between criminal and civil actions. It says, any civil action filed under this section shall be stayed during the pendency of a criminal action arising out of the same occurrence in which the claimant is the victim. That shows that if they wanted to make that distinction between criminal and civil, they could. They did at the very same time they enacted the statute. If they wanted offense in 1596 to only mean criminal and create all of this confusion, they could have easily said an offense is a criminal action, or there were other ways they could have done it. But it makes perfect sense that they didn't make any distinction of what kind of offense because the underlying statutory provisions, for example, 1589 for forced labor, the elements are identical. Whether it's criminal or whether you're going to use that as a civil basis under 1596. But 1596 then has the limitation on prosecution, prosecutor in other countries, and it talks about the deputy attorney general. That has nothing to do with civil. That's correct. So then it doesn't apply to the civil actions. But what does apply, it tells you that an offense, I think it's conceived of in 1596, what we traditionally think of as a criminal offense. And that's specific to the criminal cases. But 1596 in the main provision, it requires that there be the alleged offender be a national of the United States or an alien lawfully admitted, et cetera, which indicates that that was their way of assuring that civil cases or any case brought would not have the great potential for foreign relations problems because they were eliminating the target to U.S. nationals or those present in the U.S. Isn't it most plausible that Congress may indeed have thought that it was right in the statute to apply for the civil provision to apply territorially? It was deciding this before RJR Nabisco. And it just did not do what it needs to do under the Supreme Court's RJR Nabisco analysis to make that clear. Well, as both the legal scholars brief, which really focuses on that issue and as we mentioned in our reply brief, if you go through the predicate acts analysis of RJR Reynolds, it fits perfectly with that assessment. That 1596 makes those predicate acts extraterritorial and 1595 allows you to bring the claim that is now made extraterritorial. And again, they passed these at the same time and it fits together beautifully. And I didn't hear the other side mention the cases involved. Like Adhikari, the Fifth Circuit went right to the explicit grant of extraterritorial jurisdiction, had no problem saying that that is what it did. So I think that that is at least we support that position. I wanted to also just briefly talk about the venture issue because my time is quickly ending. Again, as I said in my opening remarks, their venture argument depends entirely on a cartoon notion of what we're saying about a venture. It repeated, repeated, repeated that we just mean you purchased something. That's the argument they were making about the mobile cell retail buyer. That's not our argument at all. And we're not inventing a venture standard. We're applying the case law that we cite in our briefs for both of those tests, either the association in fact test from 1591E6 or the continuous business relationship with a tacit agreement. We are applying those tests and they fit perfectly here. They show that there's an ongoing business relationship. There clearly is some kind of agreement between the companies and the cobalt mines. And the fact of these policies shows a contractual relationship. So that is a perfect fit for the tests that already exist. We're not making those up. Numerous cases have used those tests and we're simply applying those. I wanted to also just briefly mention that in terms of the chain of production, the chain of command here, every single time we mention Glencore and the mines, we include that Glencore owns or controls those mines. That was our research. We determined that that was a fact and that's in the complaint. And similarly, when we talk about Ishmael, for example, we call him an agent or an operator for the mine. So that chain is pretty small. It goes Ishmael, the mine, Glencore, and then they're in a venture with the companies. Finally, I would just like to point out that it sounds like in all of the argument here that we're talking about possibly competing theories. But I want to stress this was a motion to dismiss. Our theory is plausible. And in this court's decision in Banneker Ventures versus Graham, at page 16 of our reply brief, this court said if there are alternative theories that make sense that are plausible, the plaintiffs prevail on a motion to dismiss. We don't need to be the only theory. Our theory is plausible on all of these issues. We ask the court to reverse the district court on all six of the rulings that are wrong as a matter of law. Thank you, Your Honor. Thank you, counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Pillard, Rao